FILED
2014 Mar-31  PM 12:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **STEVEN C. LONG,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO.** |
| | ) **7:12-cv-3715-KOB** |
| **CAROLYN W. COLVIN** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

On December 29, 2009, the claimant, Steven C. Long, filed applications for Disability Insurance Benefits and Supplemental Security Income Payments, under Title II and Title XVI of the Social Security Act.  (R. 140, 135).  The claimant alleges disability commencing on July 5, 2009 because of hypertension and gout.  The Commissioner denied the claims on March 8, 2010.  (R. 70-81).  After the Social Security Administration disapproved the claimant's application, but before the administrative hearing, the claimant filed a second disability report alleging additional disabilities of pain, depression, high cholesterol, and diabetes.  (R. 222).

The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on May 26, 2011.  (R. 82-87, 31-59).  In a decision dated July 19, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for Disability Insurance Benefits and Supplemental Security Income Payments.  (R. 9-30).  On August 28, 2012, the Appeals Council denied the claimant's request for review; consequently,

the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-6). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

In his decision, the ALJ considered the claimant's mental impairments, in comparison to Listing § 12.05, because of a mental evaluation submitted before the hearing, and because of testimony regarding the claimant's educational history and mental inabilities given at the hearing. (R. 15, 19, 22-24, 36-51, 352-355); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A §§ 12.00, 12.05 (2013) [hereinafter Listing § 12.05, and as consistent with other sections following Part A of Appendix 1]. For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether the ALJ erred in finding that the claimant did not meet Listing § 12.05(C).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts a new, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as there is substantial evidence in the record supporting it.

However, the court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); C.F.R. §§ 404.1520, 416.920.

To meet Listing § 12.05 for "mental retardation,"[2] a claimant must meet the introductory diagnostic description of the diagnosis to the extent that it further meets a level of severity detailed in any one of the four sets of criteria that follow. Listings §§ 12.00, 12.05. The introductory paragraph of § 12.05 requires that a claimant show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Listing § 12.05; *see also Perkins v. Comm'r, Soc. Sec. Admin.*, No. 13-12024, 2014 WL 223905, at *2 (11th Cir. Jan. 22, 2014) (quoting *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)) (the Eleventh Circuit divided the introductory paragraph into three separate factors).

To fulfill the introductory description and meet the required level of severity through § 12.05(C), the claimant must show "[a] valid verbal, performance, or full scale IQ of 60-70 and a

---

[2] "On August 1, 2013, . . . the [SSA] amended Listing 12.05 by replacing the words 'mental retardation' with 'intellectual disability.' This change was made because 'the term "mental retardation" has negative connotations,' and 'has become offensive to many people.' The [SSA] stated that the change 'does not affect the actual medical definition of the disorder or available programs or services.' Because the amendment does not effect a substantive change, and to avoid confusion, this opinion uses the term "mental retardation" used by the parties and the ALJ." *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x. 980, 982 n.2 (11th Cir. 2013) (citations omitted).

physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" Listing § 12.05(C) (the SSA evaluates the additional impairment's effect on functional limitation according to the definition of a "severe impairment," as used in step two of the five step sequential evaluation process and defined in §§ 404.1520(c) and 416.920(c).  *Id.* § 12.00(A)).  Because the introductory description is generally satisfied by evidence proffered in support of § 12.05(C), the Eleventh Circuit has held that "a claimant meets the criteria for *presumptive disability* under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than a 'minimal effect' on the claimant's ability to perform basic work activities." *Smith v. Comm'r of Soc. Sec.*, 535 F. App'x 894, 897 (11th Cir. 2013) (emphasis added) (quoting *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)).

Because the IQ score is "essential" to meeting § 12.05(C), the Eleventh Circuit guides an ALJ in how to properly consider an IQ score.  Listing § 12.00(D)(6) (explaining the need for "standardized intelligence test results" in all cases, except when precluded as in § 12.05(A)).  In *Hodges v. Barnhart*, the Eleventh Circuit established that a valid IQ score creates a rebuttable presumption of "a fairly constant IQ score throughout [his or] her life[,]" "absent evidence of sudden trauma that can cause retardation." 276 F.3d 1265, 1268 (11th Cir. 2001).  The *Hodges* court applied this presumption to the introductory requirement that a claimant must show deficits in adaptive functioning before the age of twenty-two.  Therefore, a claimant's valid IQ score creates a rebuttable presumption that he or she manifested deficits in adaptive functioning prior to the age of twenty-two. *Id.* at 1268-1269 (the court also includes in this presumption that a "mental disability" arose before the age of twenty-two, using the two phrases interchangeably).

However, in *Popp v. Heckler*, the Eleventh Circuit held that "[t]he ALJ is required to examine the results [of an IQ test] in conjunction with other medical evidence and the claimant's daily activities and behavior[;]" an IQ score alone is not conclusive evidence of a mental disability. 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (emphasizing that an IQ score "must be examined to assure consistency with daily activities and behavior"). The SSA also instructs an ALJ to look to the narrative report that accompanies the test results, as it "should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." Listing § 12.00(D)(6)(a); *see also Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984 n.6 (11th Cir. 2013). Therefore, the presumption enunciated in *Hodges*, that a claimant's IQ score evidences deficits in adaptive functioning before the age of twenty-two, may be rebutted when the IQ score is inconsistent with record evidence of a claimant's daily activities and behavior. *Hodges*, 276 F.3d at 1269; *Lowery*, 979 F.2d at 837.

While the burden rests with the claimant to prove a disability, the ALJ has a duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(c). When the evidence shows that the claimant has a mental impairment, the ALJ may determine that the claimant is not disabled "'only if the [ALJ] has made every reasonable effort' to obtain the opinion of a 'qualified psychiatrist or psychologist.'" *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) (quoting 42 U.S.C.A. § 421(h)); *see also* 20 C.F.R. § 416.903(e). Because the ALJ has a duty to develop the medical record fully and fairly, "it is reversible error for an ALJ not to order a consultive examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen*, 848 F.2d 1206, 1209-10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984). The ALJ's duty to order a consultative

examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919.  Further, the Eleventh Circuit holds that "[a]n ALJ . . . abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Maybury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring).

## V. FACTS

The claimant was thirty-nine years old at the time of the administrative hearing and has a high school education.  (R. 16, 37).  His past work experience includes employment as an industrial paper winder helper, green lumber stacker, and industrial sweeper.  (R. 50-51, 196, 197).  The claimant alleged disability beginning on July 5, 2009 because of high blood pressure[3] and gout.  (R. 14, 135, 140, 176, 181).  After the Social Security Administration disapproved the claimant's application, but before the administrative hearing, the claimant filed a second disability report alleging additional disabilities of pain, depression, high cholesterol, and diabetes.  (R. 222).  He has not worked since July 2, 2009 and is currently receiving food stamps.  (R. 16).

*Educational Background*

In the third grade, the claimant tested with no mastery in any of the categories in Reading and Language, and in only three categories in Mathematics.  (R. 244-246).  In the fourth and fifth grades, the claimant took the California Achievement Tests and scored with no mastery in any of the thirty-six to thirty-eight categories.  (R. 242-243).  In the sixth grade, the claimant took the Alabama Competency Test and tested with no mastery in any of the fifty-three subjects, except "Literal Word Meanings," Context Clues," "Logical Organization," and "Perimeters & Areas."  (R. 241).

---

[3] Later referred to as a diagnosis of "hypertension" in the record medical evidence, in the RFC Assessment, and in the claim disapproval. The two terms are commonly interchangeable.

The claimant attended North Sumter Junior High for grades seven to twelve. In the seventh grade, the school placed the claimant in Remedial English and Vocational Education. The claimant continued his Vocational Education classes in eighth and ninth grade. In the tenth grade, the school placed the claimant in History and Science special education courses, and the claimant tested well below average of the national percentile, in every category, on the Stanford Test of Academic Skills. (R. 231, 237). In eleventh grade, the school placed him in English and Math special education courses, and the claimant took the Alabama High School Graduation Exam twice and did not pass either time. (R. 231, 236, 239). The claimant continued in the English special education course in the twelve grade. (R. 231). However, when the claimant took the same test that he took in the eleventh grade again in the twelfth grade, the claimant's score sheet noted that he passed, but included no detailed categorical scores, as reported in his two previous eleventh grade score sheets. (R. 235).

*Employment History*

The claimant was employed at McGregor Printing from 1995 to 1999 as a winder helper. This position included helping someone else, who operated the machine, to lift and stack rolls of paper onto and off of a paper winder. (R. 152, 197). From June 2000 to July 2009, the claimant was employed with Westervelt Lumber as a green lumber stacker. This position included operating a machine that cut wood by lifting and pulling wood from the machine to stack on a table. (R. 167, 196). In 2008, while working at Westervelt, the claimant also worked as an industrial sweeper at Wal-Mart, sweeping and cleaning the floors. (R. 50, 154, 159).

*Physical Limitations*

Dr. Katona first diagnosed the claimant with high blood pressure, headaches, and obesity on February 7, 2005, and hypertension on February 28, 2005, at Riverside Family Medicine.  (R. 272, 271).  For about three years, Dr. Katona treated the claimant for hypertension, high blood pressure, and headaches, usually prescribing the medication Hyzaar.  (R. 267-280).  After Hill Hospital diagnosed the claimant with gout, as described in detail below, Dr. Katona also began treating the claimant for gout on March 6, 2008.  The claimant reported that he walked better after visiting Hill Hospital.  This March visit with Dr. Katona was the claimant's last visit, as reported in the record.  (R. 266).

Dr. Houston first clearly diagnosed the claimant with gout (gouty arthritis) on June 27, 2008 in the emergency department of Hill Hospital for Sumter County.  (R. 287).  However, Dr. Houston also noted that the claimant's gout diagnosis first derived from the claimant's previous visit to the emergency department on June 23, 2008.  The specific diagnoses by Dr. Gordon, four days prior to the claimant's visit with Dr. Houston, are unclear.  (R. 290).  The claimant visited Hill Hospital again and until March 22, 2009.  (R. 281-296).  The claimant primarily complained of pain in his right wrist and in both of his feet.  The physicians treated the claimant with prescription medication, including Mobic, Allopurinol, Bactrim, Medrol, Ultram, and Celebrex.

The claimant additionally sought treatment for his gout from Dr. Lessman of Fitz Ferald & Perret Clinic from March 24, 2009 to March 30, 2009.  Over the course of three visits, Dr. Lessmann noted that the claimant had gout throughout his ankles, his knees, and in his left wrist, and prescribed medications to help with the pain, to stop the current attack, and to prevent future outbreaks.  (R. 298-303).  Although the claimant's swelling decreased, and he stated that the pain improved, Dr.

Lessmann referred the claimant to Dr. Tropeano for further and continued treatment for the claimant's gout.  (R. 298).

The claimant visited Dr. Tropeano of Tropeano Orthopaedics & Sports, for continued treatment of his gout and the pain it caused, from April 1, 2009 to May 13, 2009.  (R. 307-311).  Dr. Tropeano doubled the doses of some of the claimant's medications to reduce the pain and swelling caused by the claimant's gout in his left wrist.  (R. 311).  Although Dr. Tropeano's treatment helped reduce the pain and swelling in one of the claimant's feet, the claimant's left wrist continued to be problematic.  (R. 309).  Dr. Tropeano also took the claimant off of work for two weeks to see improvement with the claimant's wrist pain and swelling.  (R. 307-308)

The claimant sought further treatment for his gout, hypertension, and obesity from Certified Registered Nurse Practitioner Terre Moore of the Blackbelt Clinic of Livingston, from May 22, 2009 to July 29, 2009.  (R. 313-323).  CRNP Moore saw the claimant four times, and treated the claimant's gout with prescription medication, and injections given on two separate visits.  (R. 313, 317, 320, 323).

Dr. Walton, of Sumter County Health Center, first saw the claimant on November 13, 2009, when he sought treatment for a fall four days prior to the visit.  At this initial appointment, Dr. Walton diagnosed the claimant with uncontrolled hypertension, head trauma, cervical strain, and obesity.  Dr. Walton noted that the claimant's medical history seemed to include arthraligas (joint pain), gout, hypertension, and obesity.  (R. 325).  On January 28, 2010, Dr. Walton included in his assessment that the claimant had a history of gouty arthritis.  (R. 330).  On April 29, 2010, Dr. Walton officially diagnosed the claimant with Type II Diabetes Mellitus.  (R. 347).  For about three years, the claimant consistently complained of foot and wrist pain, and Dr. Walton consistently

treated the claimant for hypertension and obesity, and since the date of diagnosis, diabetes and gouty arthritis.  (R. 325-330, 337-350, 357-358).  Aside from treating with prescription medications, Dr. Walton also suggested x-rays, a consultation at a nerve center, and various surgical remedies, but the claimant never followed through because of the large financial obligations. (R. 330, 337, 341, 343, 345, 350).  The claimant continued treatment with Dr. Walton until May 20, 2011.  (R. 357).

*Mental Limitations*

Dr. Donald W. Blanton, Ph.D. first diagnosed the claimant with mild mental retardation on March 23, 2011 at Selma Family Medicine Center of the School of Medicine at the University of Alabama at Birmingham.  (R. 355).  The claimant visited Dr. Blanton for a consultative mental evaluation at the request of the claimant's attorney.  Dr. Blanton administered the Wechsler Adult Intelligence Scale-IV, an IQ test.  The claimant obtained a Verbal Comprehension score of 66, a Perceptual Reasoning score of 65, a Working Memory score of 74, a Processing Speed score of 68, and a Full Scale IQ score of 62.  (R. 353).  Dr. Blanton also administered the Wide-Range Achievement Test (Revised III), in which the claimant tested at a second grade level in Reading and Spelling, and a third grade level in Arithmetic.  (R. 354).

Dr. Blanton stated the following, in narrative of his medical testing and evaluation:

> In summary, Steven C. Long . . . scored in the mild range of mental retardation on the administration of the WAIS-IV.  This score was felt to be a valid estimate of his current level of intellectual functioning, as there were no distracting factors during the testing session, and he appeared to put good effort into his work.  Academic achievement testing reveals that his academic skills would be of very limited use to him in a vocational setting making retraining difficult.  Although he does appear to be having chronic pain, he does not appear to be having any significant psychological problems at this time. . . . It is my opinion based upon my examination and testing today, that Steven C. Long has marked limitations that seriously interfere with his ability to perform work related activities on a day to day basis in a regular work setting in the following areas:

1.  Understanding detailed or complex instructions.
2.  Carrying out detailed or complex instructions.
3.  Remembering detailed or complex instructions.
4.  Use judgment in detailed or complex work-related decisions.

This patient demonstrates deficits in adaptive functioning likely manifested prior to age 22 in the following areas: self care, health and safety, functional academic skills.

(R. 354-355).

*The Administrative Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 8, 31-59, 70-81, 82-87). At the hearing, the claimant testified that he is unable to work primarily because of a cyst and gout causing pain in his wrists, and because of diabetes causing pain in his feet, limiting his ability to hold and grip items, and affecting his ability to walk, sit, and stand. The claimant reported that on an average day, depending on the weather, he has a pain level of seven-to-nine out of ten in both his wrists and feet. (R. 40-41).

According to his testimony, the claimant's pain in his wrists and feet prevents him from functioning normally. He lives with his parents, and his mother completes all the household chores. The claimant is unable to wash the dishes or complete any yard work, and he often drops his medicine. Although he used to ride horses, the claimant's daily activities now consist of watching television, sitting in the yard, and sometimes going to the grocery store. On trips to the grocery store, the claimant stated that he can only walk around the store for two to five minutes before having to retreat to the car to sit. The claimant also testified that he is unable to sleep through the night and that he does not rest well. (R. 43, 47-49).

As to the pain in his feet, the claimant stated that he walks with a limp, can only walk about

half a block, can only stand for about five to ten minutes, and lies down for four to six hours out of an eight hour day with his feet elevated to reduce the pain. However, the claimant also testified that he can only sit down for about thirty minutes before needing to stand. The claimant feels numbness, burning, and the sensation of pins sticking the bottom of his feet. The claimant stated that his feet will swell and start to burn if he keeps his shoes on. When asked about the effectiveness of the injections given by Dr. Walton, the claimant stated that they only eased the pain some. Dr. Walton also prescribed Lyrica and then Neurontin, which worked about the same according to the claimant. (R. 41-44).

The claimant testified that he has headaches two to three days out of a week. To reduce the pain from the headaches, he takes Tylenol and goes to a room by himself with no noise or light. The claimant also stated that he takes medication for high blood pressure, diabetes, cholesterol, and additionally takes ibuprofen, an acid pill, and medication for his sinuses. (R. 47).

In review of the claimant's mental capabilities, the claimant's attorney asked about his educational history, work history, and any assistance that he received in his applications to work and receive disability benefits. In the seventh grade, the claimant testified that the school placed him in remedial English. The claimant also stated that he failed Science in the seventh grade, but the school still passed him to eighth grade. In eighth and ninth grade, the claimant stated that he took vocational educational classes. The claimant stated that in the tenth grade the school placed him in special education classes for History and Science. In the eleventh grade, the claimant testified that the school placed him in special education classes for English and Math; he remained in the special education course for English in the twelve grade. Additionally, the claimant testified that he took the driver's license test five or six times before he passed. (R. 39-40).

As to the claimant's work history, he stated that he did not operate a machine while employed with McGregor Printing, but was a machine helper and only helped with a paper winder, always having someone with him while helping to wind rolls of paper. In application for work at McGregor Printing, the claimant stated that a current employee helped him fill out the application. In response to clarifying questions by the vocational expert about the claimant's work at Westervelt, the claimant testified that he operated a machine that stacks lumber after it has been cut. When the claimant applied for work at Westervelt, he stated that the temp service helped him fill out the application because he could not do it himself. After testifying that he worked at Westervelt for nine years, the claimant stated that he stopped working in July of 2009 because his medical problems, specifically his gout, caused him to have too many absences. (R. 38). The claimant again clarified his work for the vocational expert when he stated that the work he did as an industrial sweeper was cleaning and sweeping the floors at Wal-Mart. (R. 50). When the claimant applied for disability benefits, he testified that he had a friend help him read and fill out the application. (R. 45-46).

A vocational expert, Dr. Robert John Beadles, Jr., testified concerning the type and availability of jobs the claimant was able to perform. (R. 49-50, 51-58). After obtaining clarification from the claimant on the type of work completed, Dr. Beadles categorized the claimant's work history according to the Dictionary of Occupational Titles. The jobs included a green lumber stacker, light and semi-skilled; a winder helper, medium and semi-skilled; and an industrial sweeper, medium and unskilled. (R. 51). The ALJ then asked the vocational expert four hypothetical questions about the claimant's ability to perform work in the national and regional economy.

For the first question, the ALJ instructed Dr. Beadles to assume a hypothetical person with the claimant's age, education, prior work experience, who can perform work at the light exertional

level with the following physical limitations: must alternate sitting and standing, at will, to relieve pain or discomfort; must elevate feet 12 to 18 inches, at will; cannot climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently balance, kneel, crouch, crawl, and stoop; can frequently reach, handle, finger, and feel; must avoid concentrated exposure to extreme heat and cold; can have concentrated exposure to vibration, humidity, and wetness; and must avoid all hazardous machinery and unprotected heights.  (R. 51-52).  The ALJ also asked Dr. Beadles to assume the hypothetical person had the following "moderately limited" mental abilities: understanding and remembering detailed instructions; carrying out detailed instructions; and sustaining an ordinary routine without special supervision.  (R. 52-53).

Dr. Beadles stated that this individual could not perform any of the claimant's past relevant work, nor could this individual perform any work in the national or regional economy because of the elevation level required.  (R. 53).

The ALJ then posed the second hypothetical by adjusting the elevation requirement to just twelve inches.  Dr. Beadles stated that this elevation would still "affect the job performance, especially for assembly-type work with limitations."  (R. 53).

The ALJ then asked a third hypothetical, suggested by Dr. Beadles, and adjusted the elevation to eight to ten inches, with the above limitations remaining the same.  Dr. Beadles stated that this person could find work in the national and regional economy, as a gate guard, a packer, and a sorter, all able to be performed in a sit-stand or neutral body position.  (R. 54).

For the fourth hypothetical, the  ALJ added the following limitation:

> Due to a combination of medical conditions and associated pain as well as mental impairments, the individual's unable to sustain sufficient concentration, persistence, or pace to do even simple, routine tasks on a regular and continuing basis, for eight

hours a day, five days a week, for a forty-hour work week or an equivalent work schedule.

(R. 54-55). Dr. Beadles stated that with this additional limitation, the individual would not be able to perform any work in the national or regional economy. (R. 55).

The claimant's attorney asked Dr. Beadles what percentage of time a job requires a worker to stay on task and how this requirement might affect a worker's need to change positions, and ability to sit and stand at will. Dr. Beadles stated that a worker needs to be at a job 100% of the time. As to the jobs Dr. Beadles suggested earlier, the need to sit and stand would not affect work as a gate guard or a sorter, but that if the packer job was on an assembly line, like any production-type job, then it "probably could impact that job." (R. 55-58).

The claimant's attorney additionally asked Dr. Beadles about the longevity of a person's position in an unskilled job, and how many absences the job would tolerate after a probationary period. Dr. Beadles concluded that the job would tolerate "probably two, at best," before the person is let go, "and those would require some type of documentation." (R. 58). Dr. Beadles also stated that, based on the claimant's testimony of his pain and what was needed to alleviate the pain, the claimant could not be competitively employed. (R. 58).

### *The ALJ's Decision*

On July 19, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 9, 12-26). The ALJ did find that the claimant met the insured status requirements of the Social Security Act through December 31, 2014, and that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability on July 5, 2009. The ALJ also found that the claimant had the following severe impairments: gouty arthritis; hypertension; diabetes mellitus, Type II; borderline intellectual functioning; mild mental retardation;

migraine headaches; and obesity.  The ALJ found these impairments to be severe, "significantly limit[ing] [the claimant's] physical or mental ability to do basic work activities," as defined in sections 404.1520(c) and 416.920(c).  20 C.F.R. §§ 404.1520(c), 416.920(c) (2013).  (R. 14).  The ALJ then stated that he considered "the credible, objective medical evidence and the claimant's subjective symptomology," and compared the claimant's impairments to Listings §§ 4.03, 9.08, 12.05, and 14.09.  (R. 15).  The ALJ concluded that the "claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  *Id.*

The ALJ next considered the claimant's opinion evidence, and subjective allegations of pain and other symptoms, to "the extent [that the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (R. 15).  He determined that the claimant had "the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)," and that

> [H]e must alternate sitting and standing and be able to elevate feet 8 to 10 inches to relieve pain and discomfort; no climbing ladders, ropes, or scaffolds; frequent climbing ramps and stairs; frequent balancing, kneeling, crouching, crawling, stooping; frequent reaching, handling, fingering, feeling; avoid concentrate exposure to extreme heat and cold, vibration, humidity/wetness; avoid all hazardous machinery and unprotected heights; moderately limited in abilities to: 1) understand and remember and carry out detailed instructions; and 2) sustain an ordinary routine without special supervision.

(R. 15).  The ALJ found that the impairments "could reasonably be expected to cause the alleged symptoms," but the claimant's assertions of his symptoms were not credible regarding their "intensity, persistence and limiting effects" beyond the ALJ's assessment of his residual functional capacity.  (R. 20).

The ALJ supported his assessment by reviewing the claimant's medical history at Hill Hospital's emergency department, with Dr. Hornsby; Fitz Gerald & Perret Clinic, with Dr.

Lessmann; Tropeano Orthopaedics & Sports, with Dr. Tropeano; Blackbelt Clinic of Livingston, with Certified Registered Nurse Practitioner Terre Moore; Sumter County Health Center, with Dr. Walton; and Selma Family Medicine Center, with Dr. Blanton.   Following the review of the claimant's medical history, the ALJ examined each of the seven impairments he previously found to be severe, finding each non-disabling.

Specifically, as to the claimant's severe impairment of borderline intellectual functioning, the ALJ reviewed the claimant's educational history in special education courses and his scores on the WRAT-III test, administered by Dr. Blanton.   (R. 22).   The ALJ found the claimant to have "adequate adaptive functioning" and this impairment to be non-disabling because the claimant "has a driver's license and drives[,] . . . goes to the store sometimes[,] . . . [and] has worked in a number of semi-skilled jobs."  *Id.*  As to the claimant's severe impairment of mild mental retardation, the ALJ noted that this impairment was not mentioned at the hearing and that his IQ score of 62 only "placed the claimant in the mild range of mental retardation *at the time of testing*."  *Id.* (emphasis added).   The ALJ found this impairment to be non-disabling because on application for disability the claimant only alleged gout and high blood pressure, and because of the claimant's "great work history." (R. 23) (citing to record evidence of the claimant's earnings summaries (R. 149-155, 160)). Additionally, the ALJ noted case law and rules that are to be followed if a claimant's IQ score is to meet the mental disorder listing.   The ALJ did not include reference to the instant claimant and specific facts relevant to the mental disorder listing.   (R. 23).

Following the ALJ's finding of "non-disabling" for each of the claimant's seven severe impairments, the ALJ considered the opinion evidence of Dr. Blanton, who was a consulting physician. The ALJ accorded "little weight to Dr. Blanton's assessment . . . ." because "[h]is opinion

is inconsistent with the record as a whole based on the claimant's work history and earnings history."
(R. 24).

Based on "the available objective evidence treatment records, the claimant's activities, [and] the available acceptable medical sources," the ALJ found the claimant's impairments limited his work ability to perform at a light exertional level with the limitations discussed in detail in this opinion. *See supra* pp. 14-15. The ALJ found the claimant is unable to return to his past relevant work based on the claimant's residual functional capacity and testimony of the vocational expert. (R. 24). From the testimony of the vocational expert, and "consistent with the claimant's medically determinable impairments, functional limitations, age, education, and work experience," the ALJ found that the claimant is capable of "work that exists in significant numbers in the national [and state] econom[ies]." (R. 24, 25). Based on the vocational expert's testimony, the ALJ determined that the claimant could perform the duties of a gate guard, a packer, and a sorter, all of which are a light exertional level and are unskilled. Because the claimant retains the capacity to work, the ALJ concluded the claimant is not disabled under the Social Security Act. (R. 25).

## VI. DISCUSSION

### A. The ALJ Erred by Not Providing Substantial Evidence to Support His Conclusion that the Claimant did Not Meet Listing 12.05(C)

#### 1. Meeting the Listing Requirements of 12.05(C)

The claimant argues that the ALJ did not provide substantial evidence to properly find that the claimant did not meet Medical Listing § 12.05(C), "mental retardation." This court agrees and finds that substantial evidence does not support the ALJ's reasons for improperly discrediting the medical opinion of Dr. Blanton, the IQ scores of the claimant, and his educational history.

Additionally, this court considers the evidence relied upon by the ALJ in his RFC assessment in its analysis, as there was no evidence provided by the ALJ at step three of the five-step sequential evaluation process.

For the claimant to meet Listing § 12.05(C), he must show that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning" that manifested before the age of twenty-two by providing the court with evidence of (1) "a valid verbal, performance, or full scale IQ of 60 through 70" *and* (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing § 12.05(C). Evidence of the claimant's IQ score, and thus his presumptive deficits in adaptive functioning, may be rebutted *if* the record evidence, including medical evidence, is inconsistent with his daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).

As to the first criteria outlined in Listing § 12.05(C), the claimant proffered evidence of a valid full scale IQ score of 62, resulting from an IQ test administered by Dr. Blanton. (R. 353). This IQ score raises the rebuttable presumption that the claimant manifested deficits in adaptive functioning prior to the age of twenty-two, not only at the time of testing. *Hodges v. Barnhart*, 276 F.3d 1265, 1268-1269 (11th Cir. 2001); *supra* p. 5. The ALJ should consider the IQ score and its accompanying narrative report in conjunction with other medical evidence, and the claimant's daily activities and behavior to rebut the presumption. *Popp*, 779 F.2d at 1499-1500; *supra* pp. 5-6.

In three separate instances, the ALJ articulated reasons for his finding that the claimant does not meet Listing § 12.05(C). First, the ALJ found the claimant to have "adequate adaptive functioning" because the claimant "has a driver's license and drives[,] . . . goes to the store sometimes[,] . . . [and] has worked in a number of semi-skilled jobs." (R. 22). The record evidence

indicates that the claimant has worked a total number of two semi-skilled jobs.  (R. 24, 51, 186-197).
The ALJ also noted the claimant's educational history and his scores on the WRAT-III, but made
no indication of this evidence's impact on his analysis.  (R. 22).

Second, the ALJ found the claimant's mild mental retardation impairment to be non-disabling
because on his application for disability the claimant only alleged gout and high blood pressure, and
because the claimant has a "great work history."  (R. 23) (citing to record evidence of the claimant's
earnings summaries (R. 149-155, 160)).  The ALJ also noted that this impairment was not mentioned
at the hearing and that the claimant's IQ score only "placed the claimant in the mild range of mental
retardation *at the time of testing*."  (R. 22) (emphasis added).

Third, the ALJ accorded "little weight" to Dr. Blanton's opinion because it was "inconsistent
with the record as a whole based on the claimant's work history and earnings history." (R. 24).
Because Dr. Blanton was the administering physician of the IQ test taken by the claimant, this court
further concludes that the ALJ discredited and gave little weight to the IQ scores resulting from Dr.
Blanton's examination of the claimant.  The only reference to an IQ score that the ALJ made was
when he determined the claimant's mild mental retardation impairment to be non-disabling, noting
the claimant's IQ score *at the time of testing*, and case law and rules that *should* be followed when
considering a claimant's IQ score, giving no analysis on this claimant's IQ score of 62.  (R. 22-23).

This court finds that these three instances of evidentiary support given by the ALJ do not
constitute substantial evidence to support his finding that the claimant does not meet Listing §
12.05(C).  As to the ALJ's first line of reasoning in assessing the claimant's adaptive functioning,
the ALJ did not include in his analysis the fact that the claimant took the driver's license test five or
six times before he passed.  (R. 40).  The claimant further testified that he drives "very little," and

that a friend even drove the claimant to his administrative hearing.  (R. 36-37).  Simply because the claimant has the state's permission to drive and the ability to go to the store, the claimant's activities should not be construed to mean that the claimant takes part in these activities regularly.  The Eleventh Circuit has held that regularly occurring daily activities supports an ALJ's finding that a claimant lacks the requisite level of deficits in adaptive functioning.  *See Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984 (11th Cir. 2013) (Hickel worked part-time at a nursery, drove herself to work, and attended church regularly).  The daily activities of the claimant are seldom and irregular in occurrence.  Therefore, this court finds that the daily activities did not provide substantial evidence to support the ALJ's finding regarding the claimant's adaptive functioning.

Regarding the ALJ's reasoning that the claimant worked in the past as evidencing that his mild mental retardation impairment is non-disabling, the ALJ failed to acknowledge that, although the claimant was employed and received compensation, the work did not require the claimant to remember detailed or complex instructions, supervise others, or use judgment in important decisions.  While working at McGregor Printing, the claimant was a winder or machine *helper*.  (R. 51).  The claimant helped someone else, who directed the claimant's activity, to lift and stack rolls of paper onto and off of a paper winder, a job consisting primarily of manual labor.  (R. 51, 197).  At Wal-Mart, the claimant worked an unskilled job, merely sweeping and cleaning the floors.  (R. 50-51).  The claimant's last position, at Westervelt, was a green lumber stacker, operating a machine, but only to the extent that the claimant took wood that the machine cut to carry and stack on a table, again primarily manual labor.  (R. 196).  The claimant's duties in these jobs do not support the ALJ's finding that these previous positions indicate that the claimant is not disabled by his mild mental retardation impairment, in conjunction with his physical impairments.  When a claimant works in

a skilled position or manages others, the Eleventh Circuit has agreed with an ALJ's finding that a claimant's adaptive functioning is not reflective of mental retardation.  *See Perkins v. Comm'r, Soc. Sec. Admin.*, No. 13-12024, 2014 WL 223905, at *3 (11th Cir. Jan. 22, 2014) (Perkins worked as a skilled cook and managed others).  The claimant did not supervise others, nor did any of his duties require him to remember and execute detailed or complex  instructions.  This court finds that the claimant's past employment does not constitute substantial evidence that his mild mental retardation impairment is non-disabling, but instead, that the claimant's past work is consistent with the mental disability alleged.   The claimant's literal ability to work in the past, in primarily positions of manual labor, is neither indicative of his intelligence level, nor his ability to function with his present physical limitations.

Considering the ALJ's third assessment, regarding the credibility of Dr. Blanton's medical opinion and the inclusive IQ scores, the ALJ failed to support his decision to discredit Dr. Blanton's opinion with consistent medical evidence.  (R. 24).  Because no other medical opinion asserting knowledge of the claimant's mental abilities and limitations exists in the record, and because Dr. Blanton's narrative report accompanying the claimant's IQ scores affirms the validity of the scores, the ALJ erred when he disregarded Dr. Blanton's medical opinion, finding it to be inconsistent with the claimant's work and earnings history.

For substantial evidence to exist and support an ALJ's decision to discredit a medical opinion, additional medical evidence must be present.  The additional medical evidence must directly support an ALJ's choice to discredit one medical opinion from another, and it must be consistent with any medical findings by an ALJ.  In *Perkins*, the Eleventh Circuit found that substantial evidence supported the ALJ's decision to discredit a medical opinion when the ALJ found that the medical

opinion was "inconsistent with other medical opinions," as well as being based on "contrary claims by [the claimant]." *Perkins*, 2014 WL 223905, at *3. In the present case, no other medical opinion exists that provides knowledge as to the claimant's mental abilities or limitations. Therefore, this court finds that the ALJ did not provide substantial evidence to discredit Dr. Blanton's medical opinion.

Additionally, when the Eleventh Circuit has found that an ALJ properly discredited or gave less weight to an IQ score because the claimant's daily activities and behavior were inconsistent with the score, the ALJ also had considered supportive medical evidence. This supportive medical evidence usually appears in the narrative report of the administering physician accompanying the IQ test results. *See* Medical Listing § 12.00(D)(6)(a) (the SSA noting that the narrative report "should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation"). The ALJ's conclusion in this case lacks the level of evidence found by the Eleventh Circuit sufficient and to sustain rejection of a claimant's IQ score. For example, in *Hickel*, the claimant worked part time, drove, attended church regularly, took special education classes, and graduated from high school. *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984 (11th Cir. 2013). The ALJ properly found that the claimant lacked the required level of deficits in adaptive functioning, rebutting the presumption raised by the IQ scores, because *five separate medical opinions* attested to the claimant's ability to function at a higher level than the claimant's IQ scores represented. *Hickel*, 539 F. App'x at 985.

In *Smith*, the ALJ properly discredited the claimant's IQ scores because the *administering doctor* believed that her scores underestimated her intelligence, and because of the claimant's own testimony that she had average intelligence, no problems in school, and no problems with

abstraction, problem solving, or thought processes. *Smith v. Comm'r of Soc. Sec.*, 535 F. App'x 894, 897-898 (11th Cir. 2013). The court stated: "[g]iven that the administering physician . . . felt that Smith's IQ scores underestimated her intelligence, the ALJ properly determined that Smith did not present a valid IQ score of 60 through 70." *Smith*, 535 App'x at 897.

The ALJ in *Popp* properly discredited the claimant's IQ scores because, not only did the claimant teach high school algebra and was about to complete the requirements for a bachelor of science degree, *two medical opinions were in conflict* and both commented on the claimant's tendency to exaggerate answers and appear untruthful. *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).

The record in this case lacks such supporting evidence. Instead, Dr. Blanton stated the following, in narrative of his medical evaluation: "Steven C. Long . . . scored in the mild range of mental retardation on the administration of the WAIS-IV. *This score was felt to be a valid estimate of his current level of intellectual functioning*, as there were no distracting factors during the testing session, and he appeared to put good effort into his work." (R. 352-355) (emphasis added). Dr. Blanton does not suggest that the claimant was untruthful, attempted to embellish his answers to the IQ test, or that the scores underrepresented the claimant's true intelligence level, all factors which the Eleventh Circuit have found supporting an ALJ's rejection of an IQ score. *See Popp*, 779 F.2d at 1500; *see Smith*, 535 F. App'x at 897; *Hickel*, 539 F. App'x at 985.

Furthermore, the facts surrounding the claimant's daily activities and behavior are consistent with Dr. Blanton's opinion, and the record evidence as a whole. Unlike in *Popp*, the instant claimant has no education or degree past high school, is not currently enrolled in higher education, and has no history of teaching others any subject matter. *See Popp*, 779 F.2d at 1499-1500. Conversely, the

claimant admits to taking multiple special education courses, having trouble reading, and receiving help filling out his application for disability benefits, and two work applications.  (R. 39, 45-46).

Therefore, this court finds that the ALJ did not provide substantial evidence to disregard the claimant's IQ scores resulting from Dr. Blanton's examination because Dr. Blanton validated the claimant's IQ score in his narrative report, no additional medical evidence conflicted with Dr. Blanton's medical opinion, and no facts regarding the claimant's daily activities and behavior are inconsistent with Dr. Blanton's opinion and the record evidence as a whole.

Rather than discrediting Dr. Blanton's medical opinion and the inclusive IQ scores without any basis in a conflicting medical opinion, the ALJ should have ordered a consultive examination to quiet any doubts the ALJ held about the claimant's mental disability.  Because the ALJ has a duty to develop the medical record fully and fairly, "it is reversible error for an ALJ not to order a consultive examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen*, 848 F.2d 1206, 1209-10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).  The ALJ's duty to order a consultative examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919.

If the ALJ ordered a consultive examination and the ALJ found that the opinion conflicted with Dr. Blanton's opinion, substantial evidence might exist to support the ALJ's decision to accord less weight to Dr. Blanton's opinion and the inclusive IQ score.  But, by simply rejecting a medical opinion regarding mental functioning, with no other existing medical opinion, the ALJ improperly placed himself in the shoes of a physician.  *See Maybury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring) ("[a]n ALJ . . . abuses his discretion when he substitutes his own

uninformed medical evaluations for those of a claimant's treating physicians.")   Although Dr. Blanton is not a treating physician in the instant case, he is the administering physician and the *only* physician to provide an opinion as to the claimant's mental disability.

As to the second criteria required in Listing § 12.05(C), this court finds that substantial evidence exists to support a finding that the claimant has physical impairments that impose an additional and significant work-related limitation of function.   *See* Listing § 12.05(C).   The ALJ found the claimant to have seven *severe* impairments that affect his ability to work.   (R. 14).   The ALJ found that the severity of these impairments imposed "an additional and significant work-related limitation of function." Listings §§ 12.00(A), 12.05(C).   Because the SSA defines the standard in the second criteria of Listing § 12.05(C) the same as the definition of severity at step two of the five-step sequential evaluation process, based upon the ALJ's own finding of seven severe impairments, this court finds that substantial evidence supports a finding that the claimant meets the second criteria of Listing § 12.05(C).   *See* Listing § 12.05(A); 20 C.F.R. §§ 404.1520(c), 416.029(c).

2.   *Other Concerns*.

The claimant also argues that the Commissioner improperly found that the claimant has boderline intellectual functioning as a severe impairment at step two of the five-step sequential evaluation process because this finding is not supported by the record medical evidence and it directly conflicts with the ALJ's finding that the claimant's mild mental retardation is also a severe impairment.   (Plaintiff's Brief 6-8); *supra* pp. 16-17.   Because the first issue on appeal is meritorious, the court does not find it necessary to address the second issue.   However, on remand, the court urges the ALJ to consider whether substantial evidence exists, *based on medical evidence*, to find that the claimant suffers from the medical impairment of boderline intellectual functioning.

## VII. CONCLUSION

For the above reasons, this court finds that the ALJ failed to provide substantial evidence to support his conclusion that claimant does not have an impairment or combination of impairments that meets or medically equals one of the medical listings, specifically Listing § 12.05(C). Therefore, this court will REVERSE and REMAND the Commissioner's decision for the ALJ to determine whether the claimant is entitled to Disability Insurance Benefits or Supplemental Security Income Payments.

This court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 31st day of March, 2014.


_Karon O. Bowdre_
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE